Docket No. 103543.

# IN THE
# SUPREME COURT
# OF
# THE STATE OF ILLINOIS

THE VILLAGE OF MUNDELEIN, Appellant, v. WISCONSIN CENTRAL RAILROAD, Appellee.

*Opinion filed January 25, 2008.*

JUSTICE KILBRIDE delivered the judgment of the court, with opinion.

Chief Justice Thomas and Justices Freeman, Fitzgerald, Garman, Karmeier, and Burke concurred in the judgment and opinion.

## OPINION

Defendant, Wisconsin Central Railroad (Wisconsin Central), was issued a citation for violating an ordinance enacted by plaintiff, the Village of Mundelein (Village), prohibiting obstruction of a railroad-highway grade crossing. Following a bench trial, the trial court found Wisconsin Central guilty of violating the ordinance and imposed a fine of $14,000 plus costs. The appellate court reversed the trial court's judgment and vacated the fine, holding that the Village's ordinance is preempted by the Federal Railroad Safety Authorization Act of 1994 (FRSA) (49 U.S.C. §20101 *et seq.* (2000)). 367 Ill. App. 3d 417. For the reasons that follow, we agree that the Village's ordinance is preempted by the FRSA. Accordingly, we affirm the judgment of the appellate court.

## I. BACKGROUND

The Village charged Wisconsin Central with violating its ordinance by allowing a train to block a railroad-highway grade crossing for 157 minutes. The Village's ordinance prohibits obstruction of public travel on a highway at a railroad crossing for more than 10 minutes, except when a train or railroad car is continuously moving or cannot be moved due to circumstances beyond the rail carrier's reasonable control. Prior to trial, Wisconsin Central filed a brief and offer of proof contending it did not violate the ordinance because the train was stopped due to circumstances beyond its reasonable control. Wisconsin Central also argued that the FRSA preempts enforcement of the ordinance.

At the bench trial, train conductor Bernard Kareka testified that he and the engineer assumed control of the train in Lake Villa, Illinois. The train had been left there by the previous crew on their way southbound from Wisconsin to Schiller Park, Illinois. Consisting of 3 locomotive engines and 119 cars, the train had stopped in Lake Villa for approximately three to four hours. The previous crew departed and left a note stating that the train had "bad air," meaning there was a problem with the air brakes. The previous crew had repaired a couple of air leaks by changing the gaskets between the air hoses. Based upon the note, Kareka believed the previous crew had repaired any problem with the air brakes.

Kareka testified that he looked at several cars behind the locomotives to locate the hand brakes while the engineer inspected the locomotives. They released the hand brakes identified as being set in the previous crew's report. Kareka and the engineer then conducted a job briefing, reviewed reports from the previous crew, and ensured that any cars containing hazardous materials were placed in the proper location in the train.

Kareka further testified that federal regulations require verification that the air brakes are in working order before moving the train. The crew, therefore, conducted tests on the air brake system. The crew verified that the air pressure on the rear of the train was within 15 pounds of the pressure on the front as required by federal regulations. The engineer conducted a "set and release" test to verify that the

brakes were in working order and there was sufficient air pressure throughout the brake system. Kareka testified that, as a crew taking over operation of a train already underway, they were not required to inspect the entire train or perform any tests beyond those they completed.

After completing the inspections and tests, the train left Lake Villa heading south toward the Village. Upon approaching the Village, a "hot box detector" went off, indicating that equipment was dragging from the rear car of the train. The engineer began slowing the train when a sudden loss of air pressure caused the emergency brakes to apply on each car. The train suddenly stopped.

When the crew was unable to restore air pressure in the brake system on the rear of the train, Kareka got out to make a visual inspection. He noted that his footing was "very bad" and he had to hold onto the train cars to keep his balance due to the rough roadbed and the angle of the embankment. In walking the length of the train, Kareka discovered that an "angle cock" was misaligned on one of the cars. Kareka explained that an angle cock is a valve that regulates the air flow through the brake line in the cars. He asserted that the angle cock could have been knocked out of position by debris, vibration from the moving train, or sabotage. Kareka stated that when the engineer slowed the train to pass through the Village, the brakes on the front of the train would have set faster than those on the rear due to the angle cock's misalignment. This condition caused the rear portion of the train to collide with the front braking portion.

Kareka straightened the angle cock, continued the inspection, and discovered that the "drawbar" had broken and fallen off the rear of the seventy-sixth car, six cars behind the one with the misaligned angle cock. The train had separated and the emergency brakes applied due to the broken drawbar. The drawbar had fallen under the following car damaging the air hose.

After assessing the damage, the crew positioned the separated rear portion of the train to avoid obstructing any highway crossing. The crew proceeded south with the front part of the train and left the car with the broken drawbar on a spur track. The crew then reversed the train and returned to reconnect with the rear portion left on the track.

When they reached the rear portion of the train, the crew began the process of reconnecting it to the front portion. Kareka replaced the damaged air hose and reconnected the train. The crew then conducted brake tests, restored the air pressure to the required level, and moved the train to a location blocking Hawley Street in the Village, where they removed the rear car with the dragging equipment. The crew was then required by federal regulations to perform another air pressure test on the brake system. The crew was unable to restore the brake system air pressure to the required level on the rear of the train. Kareka reinspected the train, checking for leaks in the brake system. A crew from another train assisted Kareka in inspecting the brake system for leaks.

While the train continued to block the Hawley Street crossing, a Metra commuter train arrived at the Village station. The passengers from the Metra train could not get to their cars because Wisconsin Central's train was blocking access to the parking lot. The Wisconsin Central train was then separated to allow the passengers access to the parking lot. When the passengers cleared the tracks, the train was reconnected. However, the crew was still unable to restore the brake system air pressure in the rear portion of the train to the required level.

While Kareka and other employees tried to correct the problem, another Metra train arrived at the station. The crew again separated the train to allow Metra passengers access to the parking lot. At that point, a Wisconsin Central dispatcher directed the crew to take the front portion of the train to Schiller Park. The crew verified that the front portion of the train had adequate air pressure and proceeded south to Schiller Park. The rear portion was later attached to another train and brought to Schiller Park. The parties stipulated that the train blocked the Hawley Street crossing for 157 minutes.

After hearing closing arguments by the parties, the trial court asserted that if the crew had completed a visual inspection of the train before leaving Lake Villa "there may have not been a problem." A visual inspection may have revealed the misaligned angle cock and could have prevented the subsequent problems with the train in the Village. According to the court, a visual inspection of the train was within Wisconsin Central's reasonable control. Therefore, Wisconsin Central violated the ordinance because the circumstances resulting in

obstruction of the Hawley Street crossing were within its reasonable control. The trial court further found that the Village's ordinance was not preempted by the FRSA. Accordingly, the trial court found Wisconsin Central guilty of violating the ordinance and imposed a fine of $14,000 plus costs.

On appeal, Wisconsin Central argued that enforcement of the Village's ordinance is preempted by the FRSA and by requiring a visual inspection of the train before leaving Lake Villa, the trial court imposed additional duties of inspection in an area of law preempted by the FRSA. 367 Ill. App. 3d at 421. The appellate court held that the Village's ordinance is preempted. 367 Ill. App. 3d at 432. The appellate court, therefore, declined to address the trial court's application of the ordinance to the facts of this case. 367 Ill. App. 3d at 432. The appellate court reversed the trial court's judgment and vacated the fine. 367 Ill. App. 3d at 432.

We allowed the Village's petition for leave to appeal. 177 Ill. 2d R. 315(a). We then allowed the Illinois Municipal League to file an *amicus curiae* brief in support of the Village and the Association of American Railroads to file an *amicus curiae* brief in support of Wisconsin Central. 155 Ill. 2d R. 345.


## II. ANALYSIS

On appeal to this court, the Village contends that: (1) its ordinance is not preempted by the FRSA; and (2) the trial court did not err in finding that Wisconsin Central violated the ordinance because the cause of the obstruction was within Wisconsin Central's reasonable control. The United States Supreme Court has stated that a preemption defense raises a threshold issue. *Sprietsma v. Mercury Marine*, 537 U.S. 51, 56, 154 L. Ed. 2d 466, 473, 123 S. Ct. 518, 522 (2002). The Court has, therefore, declined to address the merits or viability of underlying claims before considering preemption. *Sprietsma*, 537 U.S. at 56, 154 L. Ed. 2d at 473, 123 S. Ct. at 522. Likewise, when a preemption issue has been raised in this court, we have addressed it first before proceeding to the merits of the parties' specific claims. See *Kinkel v. Cingular Wireless, LLC*, 223 Ill. 2d 1, 15 (2006) (stating further analysis of the enforceability of an arbitration clause would not be necessary if the plaintiff's claim were

preempted by federal law). Accordingly, we will first address the parties' preemption arguments.

The supremacy clause of the United States Constitution provides that "[t]his Constitution, and the Laws of the United States *** shall be the supreme Law of the Land *** any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const., art. VI, cl. 2. State law is preempted under the supremacy clause in three circumstances: (1) when the express language of a federal statute indicates an intent to preempt state law; (2) when the scope of a federal regulation is so pervasive that it implies an intent to occupy a field exclusively; and (3) when state law actually conflicts with federal law. *English v. General Electric Co.*, 496 U.S. 72, 78-79, 110 L. Ed. 2d 65, 74, 110 S. Ct. 2270, 2275 (1990).

The determination of whether state law is preempted turns on the intent of Congress. *Wisconsin Public Intervenor v. Mortier*, 501 U.S. 597, 604, 115 L. Ed. 2d 532, 542, 111 S. Ct. 2476, 2481 (1991). When interpreting a federal statute pertaining to a subject traditionally governed by state law, courts are reluctant to find preemption unless Congress' preemptive intent is clear and manifest. *CSX Transportation, Inc. v. Easterwood*, 507 U.S. 658, 664, 123 L. Ed. 2d 387, 396, 113 S. Ct. 1732, 1737 (1993); *Mortier*, 501 U.S. at 605, 115 L. Ed. 2d at 543, 111 S. Ct. at 2482. Whether a federal statute preempts a state or local enactment presents a question of law subject to *de novo* review. *Kinkel*, 223 Ill. 2d at 15, citing *Schultz v. Northeast Illinois Regional Commuter R.R. Corp.*, 201 Ill. 2d 260, 288 (2002).

Congress enacted the FRSA in 1970 "to promote safety in *every area of railroad operations* and reduce railroad-related accidents and incidents." (Emphasis added.) 49 U.S.C. §20101 (2000). The FRSA grants the Secretary of Transportation the authority to "prescribe regulations and issue orders for every area of railroad safety." 49 U.S.C. §20103(a) (2000). The FRSA explicitly directs the Secretary of Transportation to develop and implement solutions to safety problems at grade crossings. 49 U.S.C. §20134 (2000).

The preemptive effect of regulations issued by the Secretary of Transportation is governed by an express preemption clause in section 20106 of the FRSA (49 U.S.C. §20106 (2000)). When a statute contains an express preemption clause, we must construe that

provision with a focus on its plain language that necessarily bears the best evidence of Congress' intent. *Sprietsma*, 537 U.S. at 62-63, 154 L. Ed. 2d at 477, 123 S. Ct. at 526, quoting *Easterwood*, 507 U.S. at 664, 123 L. Ed. 2d at 396, 113 S. Ct. at 1737. Section 20106 provides that:

> "Laws, regulations, and orders related to railroad safety and laws, regulations, and orders related to railroad security shall be nationally uniform to the extent practicable. A State may adopt or continue in force a law, regulation, or order related to railroad safety or security until the Secretary of Transportation (with respect to railroad safety matters), or the Secretary of Homeland Security (with respect to railroad security matters), prescribes a regulation or issues an order covering the subject matter of the State requirement. A State may adopt or continue in force an additional or more stringent law, regulation, or order related to railroad safety or security when the law, regulation, or order–
>
> (1) is necessary to eliminate or reduce an essentially local safety or security hazard;
>
> (2) is not incompatible with a law, regulation, or order of the United States Government; and
>
> (3) does not unreasonably burden interstate commerce."
> 49 U.S.C. §20106 (2000 & Supp. 2004).

By its terms, section 20106 applies only to laws, regulations, or orders "related to" railroad safety or security. 49 U.S.C. §20106 (Supp. 2004). The phrase "relating to" has been given a broad meaning. *Easterwood*, 507 U.S. at 664, 123 L. Ed. 2d at 397, 113 S. Ct. at 1738, citing *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 383-84, 119 L. Ed. 2d 157, 167-68, 112 S. Ct. 2031, 2037 (1992). The Supreme Court has interpreted that phrase to mean "having a connection with, or reference to," a certain subject matter. *Morales*, 504 U.S. at 384, 112 S. Ct. at 2037, 119 L. Ed. 2d at 167.

The Village has adopted by reference the blocked-crossing provision in the Illinois Vehicle Code (Code) (625 ILCS 5/1–100 *et seq.* (West 2004)). Mundelein Municipal Code §10.02.010 (1989). The ordinance at issue is set forth in section 18c–7402(1)(b) of the Code, providing that:

"It is unlawful for a rail carrier to permit any train, railroad car or engine to obstruct public travel at a railroad-highway grade crossing for a period in excess of 10 minutes, except where such train or railroad car is continuously moving or cannot be moved by reason of circumstances over which the rail carrier has no reasonable control." 625 ILCS 5/18c–7402(1)(b) (West 2004).

The plain language of the ordinance applies exclusively to railroad operations, requiring rail carriers to prevent obstructions of highway grade crossings except in certain specified circumstances. Section 18c–7402 is entitled "Safety Requirements for Railroad Operations." 625 ILCS 5/18c–7402(1)(b) (West 2004). The section, therefore, refers to railroad safety requirements. A "connection with, or reference to," railroad safety is all that is required for application of section 20106. See *Morales*, 504 U.S. at 384, 119 L. Ed. 2d at 167, 112 S. Ct. at 2037. The Village's ordinance has the required connection with or reference to railroad safety and, therefore, it falls within the scope of section 20106.

Having determined that section 20106 applies, we must consider whether the Secretary of Transportation has issued regulations or orders that preempt the Village's ordinance. Section 20106 dictates that to preempt state law, a federal regulation must "cover" the same subject matter, not merely "touch upon" or "relate to" that subject matter. *Norfolk Southern Ry. Co. v. Shanklin*, 529 U.S. 344, 352, 146 L. Ed. 2d 374, 382, 120 S. Ct. 1467, 1473 (2000), citing *Easterwood*, 507 U.S. at 664, 123 L. Ed. 2d at 397, 113 S. Ct. at 1738. The term "cover" is restrictive, indicating that preemption will be found only if federal regulations "substantially subsume the subject matter of the relevant state law." *Easterwood*, 507 U.S. at 664-65, 123 L. Ed. 2d at 397, 113 S. Ct. at 1738. The party advocating preemption has the burden of establishing the preemptive effect of regulations. *Easterwood*, 507 U.S. at 664-65, 123 L. Ed. 2d at 397, 113 S. Ct. at 1738.

The preemption issue here depends on whether regulations issued by the Secretary of Transportation substantially subsume the subject matter of the Village's ordinance. The Village asserts that the subject matter of its ordinance is the amount of time a standing train may

obstruct a highway grade crossing. On the subject matter of a state law, the Seventh Circuit Court of Appeals has stated:

> " 'The subject matter of the state requirement' is the safety concerns that the state law addresses. [Citation.] Generally, determining the safety concerns that a state or federal requirement is aimed at will necessarily involve some level of generalization that requires backing away somewhat from the specific provisions at issue. [Citation.] Otherwise a state law could be preempted only if there were an identical federal regulation, and, as we noted, *Easterwood* teaches that this is not so. *See* 507 U.S. at 674, 113 S. Ct. 1732 (preemption found through series of related regulations and overall structure of the regulations, although no regulation directly addressed the state requirement); *see also Burlington Northern R.R.*, 880 F.2d at 1106 (FRA regulation permitting telemetry device rather than visual inspection preempted state law requiring trains to have a caboose because both were aimed at the safety concern of monitoring brakes and signals at the rear of the train). But with too much generalizing– 'public safety' or 'rail safety'–our analysis would be meaningless because all FRA regulations cover those concerns." *Burlington Northern & Santa Fe Ry. Co. v. Doyle*, 186 F.3d 790, 796 (7th Cir. 1999).

In a recent preemption case involving a blocked-crossing statute, the Pennsylvania Supreme Court rejected an argument similar to the one the Village advances on the subject matter of its ordinance. See *Krentz v. Consolidated R. Corp.*, 589 Pa. 576, 600-01, 910 A.2d 20, 35 (2006). The plaintiffs in *Krentz* argued that the Pennsylvania blocked-crossing statute was directed at limiting the amount of time a standing train may obstruct a highway crossing. *Krentz*, 589 Pa. at 600, 910 A.2d at 35. In determining the subject matter of the statute, the Pennsylvania Supreme Court focused on its location within the Pennsylvania statutes and its plain language. *Krentz*, 589 Pa. at 600-01, 910 A.2d at 35, citing *CSX Transportation, Inc. v. City of Plymouth*, 92 F. Supp. 2d 643, 651 (E.D. Mich. 2000), *aff'd*, 283 F.3d 812 (6th Cir. 2002). The court concluded that the codification and plain language of the blocked-crossing statute indicated that its

subject matter was the regulation of the movement of trains. *Krentz*, 589 Pa. at 600-01, 910 A.2d at 35.

We agree that the codification and plain language of a statute are relevant in determining its subject matter. Here, the Village's ordinance is adopted by reference from section 18c–7402(1)(b) of the Illinois Vehicle Code. See 625 ILCS 5/18c–7402(1)(b) (West 2004). Although section 18c–7402(1)(b) is contained within the Code, it is more specifically located in subchapter 7 of the Illinois Commercial Transportation Law, entitled "Rail Carriers" (625 ILCS 5/18c–7101 *et seq.* (West 2004)). True to its name, each provision in that subchapter regulates railroads. Section 18c–7402(1)(b) is located in Article IV of subchapter 7. Article IV is entitled "Safety Requirements for Rail Carriers" (625 ILCS 5/18c–7401 *et seq.* (West 2004)). The specific title of section 18c–7402(1)(b) is "Safety Requirements for Railroad Operations" (625 ILCS 5/18c–7402 (West 2004)).

Most importantly, the plain language of the Village's ordinance applies only to rail carriers and prohibits them from allowing trains to obstruct public travel at highway grade crossings except in specified circumstances. The ordinance is aimed at keeping trains moving through highway grade crossings. As in *Krentz*, the plain language of the Village's ordinance is directed at regulating the movement of trains. Therefore, consistent with the context and plain language of the ordinance, we conclude that its subject matter is the movement of trains through grade crossings.

On this point, we note that the Village also argues the primary purpose of its ordinance is to allow police, fire, and ambulance services to be free from obstructions in responding to calls, while its secondary purpose is to prevent traffic congestion. The Supreme Court, however, has refused to rely solely upon the professed purpose of a state law and has also examined its effect when determining its impact on a federal scheme. *Gade v. National Solid Wastes Management Ass'n*, 505 U.S. 88, 105, 120 L. Ed. 2d 73, 89, 112 S. Ct. 2374, 2387 (1992). A state law may not frustrate the operation of federal law by claiming some purpose other than that specifically addressed by the federal law. Rather, the supremacy clause renders invalid any state legislation that frustrates the full effectiveness of federal law. *Gade*, 505 U.S. at 105-06, 120 L. Ed. 2d at 89, 112 S. Ct. at 2387, quoting *Perez v. Campbell*, 402 U.S. 637, 651-52, 29 L.

Ed. 2d 233, 243-44, 91 S. Ct. 1704, 1712 (1971). Thus, "[i]t is the *effect* of the state law that matters in determining preemption, not its intent or purpose." (Emphasis in original.) *Teper v. Miller*, 82 F.3d 989, 995 (11th Cir. 1996). The effect of the ordinance, and its subject matter, is to regulate the movement of trains at highway grade crossings.

We must, therefore, determine whether the Secretary of Transportation has issued regulations that substantially subsume the subject of the movement of trains at grade crossings. The parties focus primarily on federal regulations governing train speed and air brake testing. The Village argues its ordinance does not regulate train speed because it does not apply to moving trains or prescribe a minimum speed at highway grade crossings. Further, the Village argues a railroad's compliance with federal air brake testing regulations may constitute a circumstance beyond its reasonable control. Thus, the ordinance may provide an affirmative defense when a train blocks a crossing while the crew diligently conducts federally mandated air brake tests. Wisconsin Central responds that the Village's ordinance interferes with consistent application of federal regulations on speed and air brake testing.

Initially, we note that preemption does not depend upon a single federal regulation covering the subject matter of a state law. *Doyle*, 186 F.3d at 795. Rather, preemption may be found by examining related safety regulations and the overall structure of the regulations. *Doyle*, 186 F.3d at 795, citing *Easterwood*, 507 U.S. at 674, 123 L. Ed. 2d at 402-03, 113 S. Ct. at 1742.

The Secretary of Transportation has issued regulations setting maximum operating speeds for different classes of track. 49 C.F.R. §213.9(a) (1992); *Easterwood*, 507 U.S. at 662, 123 L. Ed. 2d at 395-96, 113 S. Ct. at 1737. In *Easterwood*, the Supreme Court interpreted those regulations, asserting that "the speed limits must be read as not only establishing a ceiling, but also precluding additional state regulation." *Easterwood*, 507 U.S. at 674, 123 L. Ed. 2d at 402-03, 113 S. Ct. at 1742. The Court held that the regulations "should be understood as covering the subject matter of train speed with respect to track conditions, including the conditions posed by grade crossings." *Easterwood*, 507 U.S. at 675, 123 L. Ed. 2d at 403, 113 S. Ct. at 1743.

The Secretary has also issued detailed regulations on air brake testing. 49 C.F.R. pt. 232 (2006). Those regulations provide comprehensive requirements for inspection and testing of brake systems, and control the timing and performance of tests and inspections. 49 C.F.R. §§232.201 through 232.219 (2006). Relevant to this case, the Secretary has issued regulations establishing the testing required following the removal of a car from a train and the interruption of brake pipe continuity. 49 C.F.R. §232.211 (2006). The movement of trains is restricted until the tests are completed and brake pipe pressure is restored. 49 C.F.R. §232.211 (2006).

Further, the Secretary has issued regulations on grade crossing safety. See 49 C.F.R. §§234.105, 234.106, 234.107 (2006). Those regulations control the speed of trains in the event of a failure, partial activation, or false activation of a grade crossing warning system and, in some circumstances, require trains to stop before proceeding through a crossing. 49 C.F.R. §§234.105, 234.106, 234.107 (2006).

These various regulations on train speed, air brake testing, and grade crossing safety work together to regulate and control the movement of trains at grade crossings. They control whether a train may be moved and the speed of a moving train. Taken together, the overall structure of these regulations substantially subsumes the subject matter of the movement of trains at grade crossings. We, therefore, find that the regulations manifest a clear intent to preempt the Village's ordinance on that subject matter.

We note that our decision on this issue is consistent with other federal and state cases considering preemption of similar blocked-crossing laws. See *CSX Transportation, Inc. v. City of Plymouth*, 283 F.3d 812, 817 (6th Cir. 2002); *CSX Transportation, Inc. v. City of Mitchell*, 105 F. Supp. 2d 949, 952 (S.D. Ind. 1999); *Krentz*, 589 Pa. at 604-05, 910 A.2d at 43-44; *City of Seattle v. Burlington Northern R.R. Co.*, 145 Wash. 2d 661, 673, 41 P.2d 1169, 1175 (2002). Although the blocked-crossing provisions in those cases are each somewhat different from the Village's ordinance, they are similar to the Village's ordinance because they regulate the movement of trains by prohibiting railroad obstructions at grade crossings in specified circumstances. See *CSX Transportation, Inc.*, 283 F.3d at 817; *CSX Transportation, Inc.*, 105 F. Supp. 2d at 951; *Krentz*, 589 Pa. at 600-01, 910 A.2d at 35; *City of Seattle*, 145 Wash. 2d at 667, 41 P.3d at

1172. Those blocked-crossing provisions were found to be preempted by federal regulations on train speed, train movement, or air brake testing. *CSX Transportation, Inc.*, 283 F.3d at 817; *CSX Transportation, Inc.*, 105 F. Supp. 2d at 952-53; *Krentz*, 589 Pa. at 601, 910 A.2d at 36; *City of Seattle*, 145 Wash. 2d at 673, 41 P.3d at 1175. Thus, those cases provide additional persuasive authority for our decision.

While based on different reasoning, other cases have reached the same result in finding blocked-crossing ordinances preempted by the FRSA. See *CSX Transportation, Inc. v. City of Plymouth, Michigan*, 86 F.3d 626 (6th Cir. 1996); *Rotter v. Union Pacific R.R. Co.*, 4 F. Supp. 2d 872 (E.D. Mo. 1998). A municipal ordinance establishing a train speed limit was also held preempted by the FRSA. See *City of Covington v. Chesapeake & Ohio Ry. Co.*, 708 F. Supp. 806 (E.D. Ky. 1989).

We have found one reported case that held a blocked-crossing provision was not preempted by the FRSA. See *State v. Wheeling & Lake Erie Ry. Co.*, 139 Ohio App. 3d 271, 743 N.E.2d 513 (2000). In that case, the court construed the subject matter of an Ohio blocked-crossing statute as governing the length of time a stopped train may block a highway grade crossing. The court held that the statute was not preempted because there was no federal regulation addressing that specific subject matter. *Wheeling & Lake Erie Ry. Co.*, 139 Ohio App. 3d at 274, 743 N.E.2d at 514. The court also cited *State v. Chessie System R.R.*, No. 2494 (Oh. App. January 3, 1990) (unpublished), as support for its decision. There, the Ohio Appellate Court stated without analysis that "[a]s [the FRSA] expressly allows the states to regulate essentially local safety hazards, there is no explicit or implicit preemption of the subject matter of [the Ohio blocked-crossing statute]." *Chessie System R.R.*, No. 2494 (unpublished). The court went on to address a commerce clause argument by the Railroad that compliance with both the Ohio statute and federal regulations was impossible. The court held there was no evidence in the record of the physical impossibility of dual compliance with both the state and federal regulations. *Chessie System R.R.*, No. 2494 (unpublished).

These cases are distinguishable. First, in this case, we rejected the Village's argument that the ordinance's subject matter is the amount

-13-

of time a standing train may obstruct a crossing. Rather, we determined that the subject matter of the Village's ordinance is the regulation of the movement of trains at highway grade crossings. Thus, the fact that there is no specific federal regulation governing the amount of time a standing train may block a highway grade crossing is irrelevant to our analysis. As we have found, the federal regulations as a whole substantially subsume the subject matter of the movement of trains at grade crossings. The analysis in *Chessie System R.R.* is also unpersuasive because it does not employ the statutory standards for addressing a claim of preemption under section 20106 of the FRSA. Rather, the court simply stated the Ohio statute is not preempted by the FRSA and then addressed a commerce clause argument by one of the parties on whether compliance with both the federal regulations and the state statute "is a physical impossibility." *Chessie System R.R.*, No. 2494.

The Village has failed to direct our attention to any other federal or foreign state case holding a blocked-crossing provision was not preempted by the FRSA. The appellate court specifically commented that the Village "provide[d] no authority whatsoever in support of its position that the FRSA [did] not preempt its ordinance." 367 Ill. App. 3d at 430. In this court, the Village relies heavily upon the recent Illinois appellate court decision in *Eagle Marine Industries, Inc. v. Union Pacific R.R. Co.*, 363 Ill. App. 3d 1166 (2006). We accepted that case for review and, today, reverse based upon this opinion.

Having found that the Village's ordinance is preempted, we must next consider whether the saving clause in section 20106 applies to the ordinance. The saving clause provides that:

> "A State may adopt or continue in force an additional or more stringent law, regulation, or order related to railroad safety or security when the law, regulation, or order–
>
> (1) is necessary to eliminate or reduce an essentially local safety or security hazard;
>
> (2) is not incompatible with a law, regulation, or order of the United States Government; and
>
> (3) does not unreasonably burden interstate commerce." 49 U.S.C. §20106 (2000 & Supp. 2004).

Here, the Village's ordinance is adopted by reference from an Illinois statute. See 625 ILCS 5/18c–7402(1)(b) (West 2004). The parties argue extensively on whether the saving clause is applicable only to state enactments or also encompasses laws issued by a state's political subdivisions. In our view, there is considerable uncertainty as to whether the term "State" is intended to apply only to state enactments or may also include those of a political subdivision. We need not decide that issue, however, because we conclude that even if the ordinance is treated as a state statute, the saving clause does not apply.

Overall, the ordinance fails to satisfy at least two prongs of the saving clause because it is incompatible with the federal regulations on train speed and air brake testing and it burdens interstate commerce. It is, therefore, unnecessary to discuss the first prong of the saving clause on local safety or security hazards. First, viewing train speed, the Village's ordinance prohibits rail carriers from obstructing highway grade crossings for more than 10 minutes. There are exceptions to this prohibition if the train is "continuously moving" or cannot be moved due to circumstances beyond the rail carrier's reasonable control. The ordinance, therefore, requires a train that stops for a reason within its control to clear the crossing within 10 minutes.

In those circumstances, the train may be required to adjust its speed or length to clear the crossing within 10 minutes to avoid violating the ordinance. See *CSX Transportation, Inc.*, 283 F.3d at 817 ("the amount of time a moving train spends at a grade crossing is mathematically a function of the length of the train and the speed at which the train is traveling"). The appellate court aptly summarized, "[p]ut another way, the regulation here is a regulation of train speed and length, although it applies only when a train stops at a crossing." 367 Ill. App. 3d at 428.

The Supreme Court has interpreted the federal regulations covering train speeds to preclude additional state regulation. *Easterwood*, 507 U.S. at 674, 123 L. Ed. 2d at 402-03, 113 S. Ct. at 1742. The federal regulations apply to all track conditions including those at grade crossings. *Easterwood*, 507 U.S. at 675, 123 L. Ed. 2d at 403, 113 S. Ct. at 1743. Thus, the Village's ordinance regulating train speed at grade crossings is incompatible with federal regulations

on that subject. Furthermore, the Supreme Court has held that any state regulation of train length violates the commerce clause. *Southern Pacific Co. v. Arizona*, 325 U.S. 761, 775, 89 L. Ed. 1915, 1928, 65 S. Ct. 1515, 1523 (1945). The ordinance, therefore, also fails to satisfy the third prong of the saving clause because it unreasonably burdens interstate commerce.

Next, considering the federal air brake testing regulations, we find the decision in *Krentz* persuasive. In that case, the Pennsylvania Supreme Court reviewed a blocked-crossing statute that had been interpreted as prohibiting trains from remaining stationary at highway grade crossings for an unreasonable period of time. *Krentz*, 589 Pa. at 601, 910 A.2d at 35. The determination of whether the time period of the obstruction was reasonable was a question for the jury. *Krentz*, 589 Pa. at 601, 910 A.2d at 35. In concluding that the blocked-crossing statute was incompatible with the federal brake system regulations, the court stated, "Simply put, the FRSA brake system regulations direct trains to remain stationary, while [the Pennsylvania statute] instructs them to keep moving." *Krentz*, 589 Pa. at 602-03, 910 A.2d at 36. In reviewing whether the time period of the obstruction was reasonable, the Court stated:

> "The issue of whether the FRSA preempts [the Pennsylvania statute] cannot be relegated to resolution on such a case-by-case basis. If the liability of a railroad for obstructing a given crossing depended upon the facts of each individual case, then the very essence of the FRSA as a comprehensive scheme of uniform railroad safety standards would be thwarted." *Krentz*, 589 Pa. at 602, 910 A.2d at 35-36.

Similar to the Pennsylvania statute, the Village's ordinance requires rail carriers to show that the cause of the obstruction is not within their reasonable control. The Village's ordinance calls for the same type of individualized, case-by-case determinations rejected in *Krentz*. Indeed, the Village asserts that a railroad's diligent compliance with federal air brake testing regulations "*may* constitute a circumstance beyond the control of the railroad." (Emphasis added.) However, the Village also argues that a mechanical failure is not necessarily a defense if the failure could have been detected by routine and regular inspections. These arguments illustrate the detailed case-

by-case review of the railroad's conduct required by the ordinance. The inquiry also strikes at the crux of the federal regulatory scheme of inspections and tests. We agree with the *Krentz* court that this type of individualized, case-by-case review is inconsistent with the FRSA's comprehensive set of uniform safety standards.

In sum, the saving clause does not apply because the ordinance is incompatible with the federal regulations on train speed and air brake testing. We conclude that the Village's ordinance is preempted by the FRSA and is, therefore, unenforceable. Because we have concluded that the ordinance is preempted by the FRSA, we need not consider the Village's argument that the trial court did not err in applying the ordinance to the facts of this case. Accordingly, we affirm the appellate court's conclusion that the Village's ordinance is preempted by the FRSA.

## III. CONCLUSION

For the foregoing reasons, the judgment of the appellate court is affirmed.

*Affirmed.*