# Illinois Official Reports

## Appellate Court

<table>
<tr><td colspan="2">

*Village of Chadwick v. Nelson*, 2017 IL App (2d) 170064

</td></tr>
</table>

| | |
|---|---|
| Appellate Court Caption | THE VILLAGE OF CHADWICK, Plaintiff-Appellee, v. TALEA LYNN NELSON, Defendant-Appellant. |
| District & No. | Second District<br>Docket No. 2-17-0064 |
| Filed | December 15, 2017 |
| Decision Under Review | Appeal from the Circuit Court of Carroll County, No. 16-OV-26; the Hon. John F. Joyce, Judge, presiding. |
| Judgment | Reversed. |
| Counsel on Appeal | Lester S. Weinstine, of Law Office of Lester S. Weinstine, P.C., of Morrison, for appellant.<br><br>Edward J. Mitchell, of Lanark, for appellee. |
| Panel | JUSTICE HUTCHINSON delivered the judgment of the court, with opinion.<br>Presiding Justice Hudson and Justice Spence concurred in the judgment and opinion. |

**OPINION**

¶ 1 Plaintiff, the Village of Chadwick (Village), successfully prosecuted defendant, Talea Lynn Nelson, for an ordinance violation. The basis for Nelson's prosecution was that her farm, which she co-owned with her husband, Dean Nelson, had allegedly become a nuisance by virtue of its nascent cattle operation. Because enforcement of the ordinance was preempted by the Farm Nuisance Suit Act (Act) (740 ILCS 70/0.01 *et seq.* (West 2016)), we reverse the conviction.

¶ 2 For context, we note that the Village is a rural, mostly agrarian town, with a population of about 600 residents. As is common in many small jurisdictions, the Village does not have a unified development or zoning ordinance, and so its land-use restrictions are determined by its laws concerning nuisance. See generally *Village of Euclid v. Ambler Realty Co.*, 272 U.S. 365, 388 (1926). With that in mind, we summarize the evidence presented at Talea's bench trial.

¶ 3 In October 2014, Dean and Talea purchased the subject property, a 2½-acre parcel with a single-family home, from the Village. However, there is evidence in the record indicating that Dean managed the property for the Village since around August 2013. In any event, after the Nelsons purchased the property, they used the land to host concerts and social events and as the site of their "agricultural business."

¶ 4 The Nelsons' initial "agricultural business" was, by all accounts, not a large undertaking. Justin Rahn testified that his family owned the land bordering the Nelsons' property (although Rahn's land fell just outside the Village's corporate limits). According to Rahn, since August 2013, he had an oral agreement with the Nelsons to seed, cultivate, and bale hay from roughly one-third of the Nelsons' property. In connection with the agreement, Rahn explained that, after the Nelsons purchased the property, he and Dean had to "fix" it and level several areas so that the uneven grading would not ruin Rahn's hay mower. According to Rahn, he and Dean "went in there and took the end loader *** and leveled the dirt up and disked it down" where needed; then, they "brought the drill in and *** seeded grass seed down in the spots [where] it was tore up." After the property was prepared for cultivation, Rahn stated that he "mowed it, mowed the forage, let it dry, raked it for hay, round baled [the hay], removed it from [the] property, and fed it to [his own] livestock at least once a year and sometimes twice a year." Rahn paid the Nelsons $10 for each round bale he reaped from their farm, totaling between five and eight bales roughly every six months.

¶ 5 According to twin affidavits from Dean and Talea, on March 2, 2016, the Nelsons shifted from their initial agricultural use of their property to "a commercial calf nursing operation." The Nelsons' stated business plan was to "raise and sell these calves" to 4-H club members and to other local businesses. (4-H is a youth development and mentoring organization. See *What Is 4-H?*, National 4-H Council, https://4-h.org/about/what-is-4-h/ (last visited Dec. 15, 2017).) According to the Nelsons, as of August 3, 2016, there were 19 calves in their inventory.

¶ 6 On July 11, 2016, however, the Village enacted "Ordinance No. 540." See Village of Chadwick Ordinance No. 540 (eff. July 11, 2016). The ordinance declares that "the presence of certain animals" in the Village constitutes a nuisance, and it declares the following:

> "SECTION 1: KEEPING PROHIBITED ANIMALS WITHIN THE VILLAGE
> OF CHADWICK: It shall be unlawful for any person [or corporate] entity to keep in
> the Village of Chadwick any live cattle, horses, swine, potbellied pigs, sheep, goats,

mules, donkeys, or any animal raised for fur bearing purposes, chickens, ducks, geese, turkeys, quail, peafowl, pigeons, guineas, partridges, pheasants, and other similar species."

The ordinance goes on to authorize keeping service animals and traditional pets (such as cats, dogs, and "tropical birds") and to allow businesses such as veterinary clinics and slaughterhouses to keep prohibited animals for "a short period of time." Without an applicable exemption, however, the fine for possessing any prohibited animal in the Village is between $100 and $750 per day.

¶ 7 Village police chief Scott Marth testified that on July 23, 2016—12 days after Ordinance No. 540 was enacted—he examined the Nelsons' property and saw "approximately" a half-dozen calves. "It was hard to tell," Marth said, because "[s]ome of them were laying down." Marth issued Talea a citation under Ordinance No. 540, for keeping livestock on the property. Apart from that violation, Marth testified that he was not aware of any specific complaint about the Nelsons' property.

¶ 8 Throughout the trial, Talea maintained that the Village was preempted from enforcing Ordinance No. 540 by the Act. As we discuss below, the Act insulates farmers against nuisance suits after a farm has been in operation for a year. The trial court rejected Talea's contention that her farm qualified for immunity under the Act. After closing arguments, the trial court accepted Rahn's testimony that he had worked on the Nelsons' property, stating, "That's technically I guess a farming operation. It's certainly not a big operation ***." However, the court stated that "what is new to this thing" is Ordinance No. 540, which "deals with animals." The court opined that the Nelsons had altered their use of the property from a permissible farming operation to an impermissible "feedlot." The court then stated the following:

"Having been in this area and gone to parties and stuff next to feedlots, the stench is awful. I know the farmers say that's the smell of money, but I'm not going to go live in an outhouse where I'm going to eat and live. It's just not going to happen. Also, I'm not going to be covered by flies morning, noon and night for a six or seven-month period of time. I'm not going to walk out and have everything I touch including my hands just covered with those things.

They're a very good and expensive operation and people make a lot—a good living at it, but you have to be a certain kind of individual. People who live in villages and towns, that's what they don't want."

The court then determined that the Nelsons' farm began its operation when the calves arrived in March 2016, which was "well within a one-year period of time" of the enactment of Ordinance No. 540, in July 2016. The court further stated:

"I think the City has the right to do this. I think it's a violation to keep these animals and you say the little baby calves. Little baby calves grow into 900-1100 pound animals. They eat a lot. They do a lot of things. No. They violated the ordinance. I'm going to find them guilty. Actually, the only one charged here is Talea."

With that, the court found Talea guilty of a single violation of Ordinance No. 540. At the Village prosecutor's suggestion, a fine of $100 was stayed, pending the removal of the calves within roughly eight weeks; a fine would be imposed of $100 per day for each day thereafter.

¶ 9 Talea appeals, and we reverse her conviction. Because the trial court heard evidence, we defer to the court's factual findings; however, we owe no deference to the court's interpretation

of a statute, as that presents a question of law, which we review *de novo*. See generally *City of Chicago v. Alexander*, 2017 IL 120350, ¶ 27; *Gurba v. Community High School District No. 155*, 2015 IL 118332, ¶ 10; *Village of Mundelein v. Wisconsin Central R.R.*, 227 Ill. 2d 281, 294 (2008).

¶ 10     To begin, we note that the Village unquestionably had the authority to enact a nuisance ordinance such as Ordinance No. 540. That is because the legislature, through the Illinois Municipal Code, has specifically empowered local authorities to "define, prevent, and abate nuisances" as each locality sees fit (65 ILCS 5/11-60-2 (West 2014)), and historically, a locality's determination as to what constitutes a nuisance has been upheld even when there is room for honest disagreement about whether a particular condition is truly a nuisance or a hazard or is even undesirable. See, *e.g.*, *Dube v. City of Chicago*, 7 Ill. 2d 313, 325 (1955) (noise ordinance as applied to factory, which employed many local residents); *Rosehill Cemetery Co. v. City of Chicago*, 352 Ill. 11, 28 (1933) (location of cemetery, as burial nearby can comfort the bereaved). However, local control over nuisance abatement is not limitless; that is, localities cannot adopt an ordinance that is contrary to state or federal law or that interferes with the supremacy of state or federal policy. See *Village of Mundelein*, 227 Ill. 2d at 294; *Village of Sugar Grove v. Rich*, 347 Ill. App. 3d 689, 694-95 (2004).

¶ 11     Here, our concern is not with the adoption of Ordinance No. 540 so much as it is with the Village's enforcement of the ordinance against Talea. That is because the legislature has also codified the Act, which exempts certain agricultural property from nuisance actions altogether. Passed in 1981 and unchanged to this day, the Act's stated purpose is to protect the state's agricultural resources "by limiting the circumstances under which farming operations may be deemed to be a [local] nuisance." 740 ILCS 70/1 (West 2016). As noted, the Act protects *farms*. Section 2 of the Act defines a farm as follows:

> "§ 2. The term 'farm' as used in this Act means any parcel of land used for the growing and harvesting of crops; for the feeding, breeding and management of livestock; for dairying or for any other agricultural or horticultural use or combination thereof." 740 ILCS 70/2 (West 2016).

Finally, section 3 of the Act provides that, except in cases where a farm has been negligently operated (and no such claim has been made here):

> "§ 3. No farm or any of its appurtenances shall be or become a private or public nuisance because of any changed conditions in the surrounding area occurring after the farm has been in operation for more than one year, when such farm was not a nuisance at the time it began operation ***." 740 ILCS 70/3 (West 2016).

¶ 12     To determine whether Talea was exempt from prosecution under Ordinance No. 540, we begin with the plain language of the Act, which we note is quite broad. For example, the definition in section 2 contains no restrictions on the type or scope of agricultural activity necessary to qualify as a "farm." In addition, in section 3, "our legislature's use of the word 'any' to modify the phrase 'changed conditions in the surrounding area' represents an express intent that the statute be broadly applied." *Toftoy v. Rosenwinkel*, 2011 IL App (2d) 100565, ¶ 65 (Hutchinson, J., dissenting), *rev'd*, 2012 IL 113569.

¶ 13     Ultimately, Illinois decisions have followed the Act's broad language to its natural conclusion. In *Toftoy*, for example, our supreme court held that a change in the ownership of neighboring property constituted a changed condition that exempted an established cattle farm from a private nuisance suit by the new owners of the neighboring property. *Toftoy v.*

*Rosenwinkel*, 2012 IL 113569, ¶¶ 21-22. Similarly, in *Village of LaFayette v. Brown*, 2015 IL App (3d) 130445, ¶¶ 9, 22-23, it was held that the enactment of an ordinance prohibiting " 'any commercial farming' " in the village constituted a "changed condition" in the area—this despite the fact that, within the preceding year, the farm's owners had converted the property from a plant nursery to a row-crop farm for corn and soybeans. Although *dicta* in *Brown* suggested that the situation might have been different if "someone went from growing crops to creating a feedlot," the court ultimately explained that, "[b]y changing ownership and crop," the farm "does not stop being 'the' farm and become some other farm." *Id.* ¶ 32. Thus, the Act's protections are not limited to "a farm operated by the same owner and growing the exact same crops." *Id.* Rather, the Act embraces changes to the land's agricultural use; the only requirement appears to be that the land's use remain agricultural.

¶ 14    As in *Brown*, the baling of hay on the Nelsons' property was a continuous agricultural use that stretched back more than one year prior to the enactment of Ordinance No. 540. Therefore, as in *Brown*, we determine that the enactment of Ordinance No. 540 constituted a changed condition exempting Talea from prosecution for violating the ordinance. As the court in *Brown* explained, "defendants' farming endeavors could not 'become a nuisance' to the Village until the Village amended the ordinance. That change to the ordinance was a 'changed condition' that gave rise to the Village's nuisance action." *Id.* ¶ 23. Therefore, we reverse Talea's conviction of violating the ordinance.

¶ 15    In so doing, we reject the Village's argument that the Act does not apply. The Village does not dispute the finding that Rahn did, in fact, cut and bale hay on the Nelsons' property for at least the preceding year, yet it dismisses that activity as "*de minimis*." According to the Village, the Nelsons' farm began "operation" only when the Nelsons "began moving livestock onto the parcel" in March 2016, and it further asserts that the only "change" in the area was the Nelsons' decision to raise cattle on land "that was previously a vacant lot" rather than "a longstanding farm of operational significance."

¶ 16    The problem with the Village's argument is that it would engraft an unwritten condition into the statute, and a hopelessly vague one at that—*i.e.*, that a farm's activity must bear some indeterminate level of "operational significance." But the definition of "farm" in section 2 of the Act, and the immunity provision in section 3, contain no such requirement, and we are not at liberty to read into a statute exceptions, limitations, or conditions that the legislature did not express. See *Evanston Insurance Co. v. Riseborough*, 2014 IL 114271, ¶ 15. We must confine ourselves to the plain language of the statute, and, where the legislature uses specific statutory language, we are bound by it and have no need to rely on any interpretive canons. In other words, the statute speaks for itself. See *Valfer v. Evanston Northwestern Healthcare*, 2016 IL 119220, ¶ 30; *Julie Q. v. Department of Children & Family Services*, 2013 IL 113783, ¶ 41; *Exelon Corp. v. Department of Revenue*, 234 Ill. 2d 266, 284 n.1 (2009) (citing *Texaco-Cities Service Pipeline Co. v. McGaw*, 182 Ill. 2d 262, 275 (1998)).

¶ 17    We note that, in crafting the Act, the General Assembly could have defined the term "farm" or the immunity provision in such a way as to include or exclude a specific agricultural use or to restrict the scope of an ongoing farming activity. As has been pointed out elsewhere, right-to-farm laws in other states take precisely such an approach. For example, Idaho's law provides that the expansion of an existing farm operation may be considered a nuisance; meanwhile, North Carolina's law does not apply where a party fundamentally changes the nature of the farm's agricultural activity, such as by changing the farm's primary

livestock—*e.g.*, switching from turkeys to hogs—or by significantly changing the farm's hours of agricultural operation. See *Brown*, 2015 IL App (3d) 130445, ¶ 40 (Holdridge, J., specially concurring) (citing *Crea v. Crea*, 16 P.3d 922, 925 (Idaho 2000), and *Durham v. Britt*, 451 S.E.2d 1, 3-4 (N.C. Ct. App. 1994)). In another example, Iowa's law specifically distinguishes between feedlots—or "animal feeding operation[s]"—and all other types of protected agricultural activities. See Iowa Code Ann. § 657.11 (West 2016). It has been suggested that Illinois's law implicitly contains similar limitations on changes to a farm's activities (see *Brown*, 2015 IL App (3d) 130445, ¶ 40 (Holdridge, J., specially concurring)), but we perceive no such restriction in the Act's text. Rather, the Act is simply an example of the observation that "[m]ost right-to-farm laws include *no limitation* on the size of the operations that can be protected." (Emphasis added.) Neil D. Hamilton, *Right-to-Farm Laws Reconsidered: Ten Reasons Why Legislative Efforts to Resolve Agricultural Nuisances May Be Ineffective*, 3 Drake J. Agric. L. 103, 113 (1998). Once again, we note that our supreme court has recently rejected a narrow construction of the Act in favor of the Act's plain language and the broad policy favoring farming interests' priority of occupation. See *Toftoy*, 2012 IL 113569. In our view, under the Act as it exists today, the result in this case can be no different. See *Citibank, N.A. v. Illinois Department of Revenue*, 2017 IL 121634, ¶ 70 ("[t]he responsibility for the wisdom of legislation rests with the legislature, and [not the] courts").

¶ 18    A local ordinance may not infringe upon a state statute. "The Act mandates that a farm shall not be deemed a nuisance if it satisfies the requirements of the Act." *Brown*, 2015 IL App (3d) 130445, ¶ 33. That is, under the Act, absent negligent operation, a farm engaged in a protected agricultural use for at least one year may not be involuntarily restricted in its ongoing agricultural activity. Here, Ordinance No. 540 would label the Nelsons' farm a nuisance, despite the trial court's finding that the Nelsons' farm satisfies the Act's requirements. The Act controls, and the enforcement of Ordinance No. 540 against Talea is thus preempted. Accordingly, we reverse the judgment of the circuit court of Carroll County.

¶ 19    Reversed.