# ILLINOIS OFFICIAL REPORTS
## Supreme Court

---

### *Julie Q. v. Department of Children & Family Services*, 2013 IL 113783

---

| | |
|---|---|
| Caption in Supreme Court: | JULIE Q., Appellee, v. THE DEPARTMENT OF CHILDREN AND FAMILY SERVICES *et al.*, Appellants. |
| Docket No. | 113783 |
| Filed | March 21, 2013 |
| Rehearing denied | May 28, 2013 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | Under the Abused and Neglected Child Reporting Act, which calls for reports of suspected child abuse or neglect and compilation of a registry of persons found to have abused or neglected a child, an administrative law judge's 2009 finding of a mother's neglect based on injurious environment was properly reversed where the legislature had removed the injurious environment language from the Act in 1980 and did not restore it until 2012; and administrative rules promulgated during this period were beyond statutory authority where they included injurious environment in the definition of neglect. |
| Decision Under Review | Appeal from the Appellate Court for the Second District; heard in that court on appeal from the Circuit Court of Lake County, the Hon. Raymond J. McKoski, Judge, presiding. |
| Judgment | Affirmed. |

| Counsel on Appeal | Lisa Madigan, Attorney General, of Springfield (Michael A. Scodro, Solicitor General, Jane Elinor Notz, Deputy Solicitor General, and Jan E. Hughes and Nadine J. Wichern, Assistant Attorneys General, of Chicago, of counsel), for appellants. |

Michael T. Brody and Precious S. Jacobs, of Jenner & Block, and Diane Redleaf and Melissa L. Staas, all of Chicago, for appellee.

Steven L. Pick, Miriam Hallbauer, Colleen A. Connolly and Richard T. Cozzola, all of Chicago, for *amici curiae* LAF *et al.*

| Justices | JUSTICE GARMAN delivered the judgment of the court, with opinion.
Chief Justice Kilbride and Justices Freeman, Thomas, Karmeier, and Theis concurred in the judgment and opinion.
Justice Burke took no part in the decision. |

## OPINION

¶ 1      Plaintiff Julie Q. filed an administrative review action against the Illinois Department of Children and Family Services (DCFS) appealing DCFS's indicated finding of child neglect. The indicated finding resulted from an incident occurring at plaintiff's home on January 29, 2009. DCFS based its finding on its Allegation No. 10/60 titled "Substantial Risk of Physical Injury/Environment Injurious to Health and Welfare" (Allegation 60).

¶ 2      The circuit court of Lake County found that the finding was not against the manifest weight of the evidence, upheld the validity of Allegation 60, and concluded that the hearing was timely held within 90 days pursuant to DCFS rules. The appellate court reversed, concluding that Allegation 60 was void and that the finding was against the manifest weight of the evidence. 2011 IL App (2d) 100643. The appellate court did not consider the timeliness issue. We granted DCFS's petition for leave to appeal. Ill. S. Ct. R. 315 (eff. Feb. 26, 2010). For the following reasons, we affirm the judgment of the appellate court.

¶ 3                                   BACKGROUND

¶ 4      On February 17, 2009, Julie Q. received a phone call from Lavern Robinson, an investigator with DCFS. Robinson informed Julie Q. that DCFS was investigating a report of possible child abuse or neglect by Julie Q. for her actions toward her daughter M.Q. on January 29, 2009. Julie Q.'s husband and M.Q.'s father, Chris Q., made the report to DCFS after M.Q. informed him of events taking place on the evening of January 29, 2009. M.Q. reportedly told Chris Q. that her mother, who had a history of alcoholism, had been drinking

and locked M.Q. in her room and prevented her from making phone calls. At that time Chris Q. and Julie Q. were separated and Chris Q. was not living at Julie Q.'s home.

¶ 5     DCFS investigated the report and indicated Julie Q. for neglect due to her history of drinking in the home, the injurious environment it created, and the substantial risk of injury to M.Q. On March 13, 2009, DCFS entered its initial indicated finding of neglect against Julie Q. based on Allegation 60. Allegation 60 is found in title 89, section 300.Appendix B (hereinafter, Appendix B) of the Illinois Administrative Code. Appendix B lists specific incidents of harm, one of which must be alleged before DCFS will accept a report of child abuse or neglect. Under Allegation 60 a specific incident of neglect occurs when an individual "plac[es] a child in an environment that is injurious to the child's health and welfare." Appendix B then lists examples of factors to be considered in determining if the child has been placed in an environment injurious to his or her health. Julie Q. filed a notice of appeal on March 27, 2009. The hearing was delayed on multiple occasions due to continuances, the causes of which are disputed by the parties.

¶ 6     The administrative hearing began on June 23, 2009. The June 23, 2009, hearing date provided insufficient time for the parties to present their evidence, and the hearing was continued until July 20, 2009. Julie Q. first testified that she was a recovering alcoholic and that she had participated in inpatient substance abuse programs on two occasions. She acknowledged two prior arrests for driving under the influence. In 2004, she was acquitted of driving under the influence, and in 2005 she pled guilty to the same charge. Julie Q. also testified that the police were called to her home in 2005 for a call of domestic violence after she was drinking and slammed the door on Chris Q.'s leg. Julie Q. stated that she had been sober since January 29, 2006. DCFS then asked Julie Q. about the events taking place on January 29, 2009. Julie Q. acknowledged that she had a disagreement with M.Q. after M.Q. repeatedly got out of her bed between 9 and 11 p.m. that day. While stating that she restricted M.Q. to her bedroom, she denied preventing M.Q. from using the phone.

¶ 7     Robinson then testified as the primary investigator for DCFS. During Robinson's testimony, DCFS was permitted to admit DCFS's investigation file. Julie Q. objected to the admission of the file as hearsay because the file included notes written by another investigator, Analia Cobrda, regarding Cobrda's meeting with M.Q. Cobrda was not called to testify at the hearing. Robinson admitted that she had not met with Cobrda, but that she used Cobrda's notes when reaching her conclusion that Julie Q. should be indicated for neglect. Specifically, Cobrda's notes included statements made by M.Q. to Cobrda that Julie Q. had been drinking on January 29, 2009, and that she knew this because her mom's speech was slurred. M.Q. also told Cobrda that her mother was angry and made M.Q. stay in her room. Robinson then testified that the factors listed in Allegation 60 led her to recommend an indicated finding. She specifically referred to the history of Julie's past alcohol abuse and the credible statements made by M.Q.

¶ 8     DCFS also introduced testimony by two officers who had been called to Julie Q.'s home on previous occasions. This testimony was admitted over objection by Julie Q. Officer Lisa Davidson testified that on July 26, 2008, she responded to a call made by M.Q. saying that she could not wake up her mother and that she was frightened. Upon arriving to Julie Q.'s home, M.Q. showed Officer Davidson a glass containing a clear liquid smelling like alcohol.

Officer Davidson testified that Julie Q.'s speech was slurred and that she refused to take a portable Breathalyzer test. These statements were corroborated by Officer Keith Landy, who was also called to the scene. Officer Landy testified that in addition to slurred speech, Julie Q. had glassy eyes and appeared intoxicated. He also stated that he believed Julie Q. had a drinking problem and that this drinking problem put M.Q. in an environment injurious to M.Q.'s health and wellness.

¶ 9        Officer Davidson also testified to events taking place in May 2009 when officers were called back to Julie Q.'s home. Arriving at the home, Officer Davidson testified that M.Q. was visibly upset and told the officer that her mom was drinking and that she was afraid of her mom. According to Officer Davidson, M.Q. said that her mom threw a glass at her. Julie Q. again denied drinking and agreed to take a portable Breathalyzer test, but one was not given because the officers received another serious call. Officer Davidson testified that he did not smell alcohol on Julie Q. but that another officer reported that he did smell alcohol on Julie Q.'s breath. Finally, Officer Davidson noted that they took M.Q. to the police station to wait for her father to take her home.

¶ 10       DCFS also questioned Dr. Frances Pacheco, a court-appointed evaluator. Dr. Pacheco was appointed to provide an evaluation regarding the couple's custody dispute in their dissolution action. Dr. Pacheco testified that she had interviewed Chris Q., Julie Q., and M.Q. She stated that she recommended Chris Q. be awarded sole custody due to concerns of Julie Q.'s drinking and statements made by M.Q. that she was afraid of being left alone with her mother. Dr. Pacheco also testified that she did not believe that M.Q. had issues with telling the truth.

¶ 11       At the hearing, Julie Q. presented testimony by Dr. David Gates, a private therapist. Dr. Gates counseled Julie Q. from December 2008 until several months before the hearing. Dr. Gates testified that during that time he met with Julie Q. weekly and that she tested negative for alcohol at each random alcohol test administered during this time. He also stated that it was highly unlikely that Julie Q. was able to drink intermittently due to the severity of her alcoholism and that he had no reason to believe that Julie Q. had not been honest with him concerning her sobriety.

¶ 12       Ann Ramos, a counselor with the Northern Illinois Council on Alcohol and Substance Abuse (NICASA) also testified for Julie Q. Ramos stated that she met with Julie Q. in March and April 2009 and that each alcohol test administered to Julie Q. during this time came back negative. Julie Q.'s Alcoholics Anonymous sponsor, Magrit Burke, testified next. She stated that she was Julie Q.'s sponsor for three years and that during this time she spoke to Julie daily. According to Burke, Julie Q. has shown no indication of drinking and has attended twice weekly Alcoholics Anonymous meetings throughout her sponsorship.

¶ 13       Finally, a social worker from M.Q.'s school, Jennifer Perlis-Goassman, testified that M.Q. told her that she did not feel safe with her mother in November and December of 2007 because Julie Q. would drink and then pass out. Perlis-Goassman stated that M.Q. had occasionally made false statements in the past, but that it was limited to small white lies that were "extremely common with kids."

¶ 14       On August 13, 2009, the Administrative Law Judge (ALJ) issued a recommendation and

opinion. The ALJ concluded that "[a] preponderance of the evidence reveals that [Julie Q.] created an environment injurious to health and welfare of the minor." In reaching this conclusion, the ALJ found Dr. Pacheco and both officers to be credible witnesses in their corroboration of M.Q.'s statements, but that Julie Q. was not credible when she claimed she had been sober since 2006. Therefore, the ALJ recommended that DCFS had carried its burden of proof with regard to Allegation 60.

¶ 15    On October 2, 2009, Julie Q. filed a complaint for administrative review arguing that the ALJ's finding was against the manifest weight of the evidence, and that the indicated finding was in violation of the Abused and Neglected Child Reporting Act (Act) (325 ILCS 5/1 *et seq.* (West 2008)). The trial court found that the ALJ's finding was not against the manifest weight of the evidence, upheld the validity of Allegation 60 pursuant to the Act, and concluded that the finding was timely issued within 90 days of Julie Q.'s request for a hearing.

¶ 16    The appellate court reversed, finding that the ALJ's decision was against the manifest weight of the evidence as the court had improperly admitted the investigation file containing hearsay evidence and the collateral evidence relating to the events of July 2008 and May 2009. The appellate court also held that Allegation 60 exceeded the statutory authority granted to DCFS under the Act. The appellate court did not address whether the hearing was timely held.

¶ 17                                    ANALYSIS

¶ 18    DCFS argues that it was within its authority under the Act to promulgate Allegation 60. It maintains that it was within its express authority under the Act to define neglect using the "environment injurious" language. In the alternative, DCFS maintains that Allegation 60 was within its implicit authority under its power to make all rules necessary to effectuate its statutory authority. DCFS also argues that the ALJ's finding was not against the manifest weight of the evidence as the evidence relating to the July 2008 and May 2009 incidents was admissible as substantive evidence as to whether Julie Q. neglected M.Q. Finally, DCFS argues that Julie Q. has no due process claim as to the untimeliness of the hearing because Julie Q. failed to assert a due process interest and, furthermore, any delays in the case were not DCFS's responsibility.

¶ 19    Julie Q. argues that DCFS exceeded its statutory authority in promulgating Allegation 60. She notes that prior to this case, the legislature specifically removed the "environment injurious" language from its definition of neglect in the Act. Julie Q. also argues that the finding was against the manifest weight of the evidence as the ALJ improperly relied on hearsay and collateral bad acts evidence in reaching its finding. Finally, Julie Q. argues that her due process rights were violated as DCFS failed to render a decision within 90 days of her request for a hearing as required by DCFS rules.

¶ 20    The scope of powers conferred on an administrative agency by its enabling legislation is a question of statutory interpretation which we review *de novo*. *Genius v. County of Cook*, 2011 IL 110239, ¶ 25.

¶ 21    The parties initially dispute whether DCFS exceeded its statutory authority in

promulgating Allegation 60. The Act directs DCFS to protect the health, safety, and best interests of a child after receiving a report of possible child abuse or neglect. 325 ILCS 5/1 *et seq.* (West 2008). The Act provides a list of mandatory reporters and authorizes DCFS to maintain a registry of persons found to have abused or neglected a child.

¶ 22 Section 3 of the Act provides the definition of a "neglected child." In 2009 when the incidents relevant to this case took place, the Act listed four circumstances constituting a neglected child: (1) a child not receiving adequate medical care or "other care necessary for his or her well-being including adequate food, clothing, and shelter;" (2) a child abandoned by his or her parents; (3) a child who has been provided with interim crisis intervention services under the Juvenile Court Act of 1987 (705 ILCS 405/1-1 *et seq.* (West 2008)), and whose parents refuse to allow the child to return home; and (4) a newborn born with a controlled substance in her system. 325 ILCS 5/3 (West 2008). Prior to 1980, the Act included additional language in its definition of neglect, occurring when the child was placed in "an environment injurious to the child's welfare." Pub. Act 79-65 (eff. July 1, 1975). In 1980, this language was deleted. Pub. Act 81-1077 (eff. July 1, 1980). In 2012, after this case, the legislature reinserted similar environment-injurious language. Pub. Act No. 97-803 (eff. July 13, 2012).

¶ 23 In addition to the express powers granted to DCFS under the Act, section 4 of the Children and Family Services Act provides DCFS with the power "[t]o make all rules necessary for the execution of its powers." 20 ILCS 505/4 (West 2008). Pursuant to this authority, DCFS promulgated Appendix B to describe the "specific incidents of harm" that constitute abuse or neglect. 89 Ill. Adm. Code 300.Appendix B (2011). The Allegations of harm are categorized as resulting either from abuse or neglect. Allegation 60 is titled "Substantial Risk of Physical Injury/Environment Injurious to Health and Welfare" and includes "situations that place a child at substantial risk of harm due to the effects of being subjected to participation in or the witnessing of the physical force or restraint of another" as an example of an incident placing the child in an environment injurious to his or her welfare. Allegation 60 also lists factors to be considered by DCFS in reaching its finding.

¶ 24 An administrative agency has no general or common law powers. *Alvarado v. Industrial Comm'n*, 216 Ill. 2d 547, 553 (2005). The agency is limited to those powers granted to it by the legislature in its enabling statute. *Id.* An act that is unauthorized is beyond the scope of the agency's jurisdiction. *Id.* at 553-54. When the agency renders a decision that it is without statutory authority to make, it is without jurisdiction and the decision is void. *Id.*

¶ 25 DCFS argues that Allegation 60 does not exceed DCFS's authority under the Act. First, it argues that Allegation 60 falls within the Act's definition of neglect. DCFS also notes its authority to make all rules necessary to execute its powers under the Children and Family Services Act. In response, Julie Q. argues that DCFS exceeded its authority in promulgating Allegation 60. According to Julie Q., the legislature specifically deleted the "environment injurious" definition of neglect in 1980, and DCFS was without authority to add this definition back into the Act as it did with Allegation 60.

¶ 26 DCFS maintains that Allegation 60 falls within the Act's definition of neglected child. Specifically, DCFS points to the plain language of the Act and the reference in section 3 to

a child who is not receiving "other care necessary for his or her well-being, including adequate food, clothing and shelter." 325 ILCS 5/3 (West 2008). According to DCFS, the Act's use of the word "including" indicates that the subsequent list is not exhaustive. Instead, DCFS argues that this language authorizes DCFS to create its own list of what qualifies as "other care necessary" for the child's well-being.

¶ 27    In *People v. Perry*, 224 Ill. 2d 312, 328 (2007), this court noted that the word "including" "when followed by a listing of items, means that the preceding general term encompasses the listed items, but the list is not exhaustive." Rather, "[t]he preceding general term is to be construed as a general description of the listed items and other similar items." *Id*. This court held that this rule applies even when the word "including" is not followed by the phrase "but is not limited to." Therefore, DCFS is correct that because the Act uses the word "including," the subsequent list is not to be read as exhaustive.

¶ 28    In addition to its express authority under the Act, DCFS also argues that it had implicit authority to promulgate Allegation 60 as DCFS had the authority under the Children and Family Services Act to make all rules necessary to perform its powers. 20 ILCS 505/4 (West 2008). Wide latitude is given to administrative agencies to fulfill their statutory duties. *Lake County Board of Review v. Property Tax Appeal Board*, 119 Ill. 2d 419, 428 (1988). But, as discussed above, the agency is limited to the powers granted to it in the enabling statute. Therefore, even as we conclude that the list in section 3 is not exhaustive, we must still determine whether DCFS retained authority to promulgate Allegation 60 after the legislature deleted the environment-injurious definition of neglect from section 3.

¶ 29    When the Act was enacted in 1975, its definition of neglect included "subjecting a child to an environment injurious to the child's welfare." Pub. Act 79-65 (eff. July 1, 1975). However, this language was removed from the definition of neglect by Public Act 81-1077, effective July 1, 1980. Public Act 81-1077 was introduced as Senate Bill 973. In the House, it was an amendment to that bill, Amendment No. 8, which removed the environment-injurious language from the Act. It is this 1980 version of the Act that governs this case. Allegation 60 first took effect on October 12, 2001, nearly 20 years after the legislature removed the environment-injurious language. See 25 Ill. Reg. 12,781, 12,781-91 (eff. Oct. 1, 2001).

¶ 30    "Where the legislature amends an existing statute, the presumption is that the legislature intended a material change in the law." *In re K.C.*, 186 Ill. 2d 542, 549 (1999). "When the legislature amends an unambiguous statute by deleting certain language, it is presumed that the legislature intended to change the law in that respect." *Chicago Teachers Union, Local No. 1 v. Board of Education of the City of Chicago*, 2012 IL 112566, ¶ 21. This presumption, however, may be rebutted by evidence of a contrary legislative intent. *State of Illinois v. Mikusch*, 138 Ill. 2d 242, 252 (1990).

¶ 31    Therefore, we next consider the legislative history. During the floor debate in the House of Representatives, the sponsor of Amendment No. 8 stated that

> "Amendment #8 is again an attempt to reach an agreement between the various associations and groups that have come into play in working on this comprehensive reform of the Act. What Amendment #8 would do is to remove from the definition

of neglected child the words 'subjected to an environment injurious to his or her welfare' and the reasons we are removing that is the concern over the interpretation of what environment injurious may mean. We are fearful that it may end up in a lot of litigation, a lot of misunderstandings and until such time that we can arrive at a more clearer, concise kind of definition to address this kind of problem, we think it's better to remove this from the Bill." 81st Ill. Gen. Assem., House Proceedings, June 22, 1979, at 100 (statements of Representative Peters).

¶ 32 Representative Peters' statements show that the environment-injurious language was removed due to concerns regarding its ambiguity. The legislature was concerned with the possible various interpretations of the environment-injurious language. Furthermore, the legislature indicated that it was removing this language with the intent to reach a clearer and more concise definition in the future.

¶ 33 DCFS acknowledges that the phrase was removed due to concerns of ambiguity and possible confusion. However, DCFS argues that while the legislature removed the language, it did not indicate that it was an improper definition of neglect. Furthermore, DCFS notes that the language was removed at DCFS's request. As noted by Senator Buzbee on the Senate floor, "[t]he [D]epartment had requested some tightening up language in House Amendment 6 and 8 which we accepted." While the floor debate indicates that DCFS was involved in negotiating the final amendment, the notion that DCFS "requested some tightening up language" does not support DCFS's argument. Amendment No. 8 did not merely "tighten up" the language, but expressly deleted one definition of neglect.

¶ 34 DCFS also notes that the legislature removed this language with the intent to create a "more clearer, concise kind of definition to address this kind of problem." According to DCFS, Allegation 60 served this legislative intent by offering a clearer definition of "environment injurious" by listing several examples and factors for DCFS to consider.

¶ 35 Even if, as DCFS argues, the legislature removed the language due to concerns of ambiguity, this does not change the fact that the legislature deleted this definition and failed to reinsert the environment-injurious language until 2012. As DCFS is limited by the powers granted to it in the enabling statute, DCFS was without authority to reinsert a definition of neglect into the Act that had been deleted by the legislature. When the legislature stated that it was removing the environment-injurious language "until such time that we can arrive" at a clearer definition, it was referring to a time when it, the legislature, arrived at the definition. It was not granting DCFS the authority to create a definition on its own.

¶ 36 The legislature did in fact reinsert environment-injurious language into the Act in 2012. The legislature amended section 3 of the Act to expand the definition of neglected child to include a child "who is subjected to an environment which is injurious insofar as (i) the child's environment creates a likelihood of harm to the child's health, physical well-being, or welfare and (ii) the likely harm to the child is the result of a blatant disregard of parent or caretaker responsibilities." Pub. Act No. 97-803 (eff. July 13, 2012). DCFS argues that this amendment was the result of the appellate court decision in this case and that this shows the legislature supported the "environment injurious" definition of neglect. Furthermore, DCFS notes that since Allegation 60 was promulgated in 2001, the legislature had chosen not to

undo Allegation 60, even though it had the power to do so.

¶ 37 The fact that the legislature saw the need to amend the statute in 2012 by including the environment-injurious definition, however, shows that this definition was not present in the prior version of the Act. In 1980, the legislature indicated that it intended to provide a clearer definition of environment injurious and it did so in 2012. The 2012 decision to reinsert this language only reinforces our conclusion that the environment-injurious definition was removed from the 1980 version of the statute, which governs this case.

¶ 38 DCFS also argues that the appellate court's ruling will lead to absurd results. Specifically, DCFS maintains that this result is in conflict with the Juvenile Court Act, as that act includes environment-injurious language in its definition of a neglected minor. 705 ILCS 405/2-3(1)(b) (West 2010) ("any minor under 18 years of age whose environment is injurious to his or her welfare"). According to DCFS, it would be inconsistent for a person to be found to have neglected a child under the Juvenile Court Act, while DCFS could not issue an indicated finding under the Abused and Neglected Child Reporting Act for the same conduct. In support of this argument, DCFS argues that under section 7.16 there is no right to a hearing under the Act if there has been a court finding of neglect. 325 ILCS 5/7.16 (West 2008).

¶ 39 The Act and the Juvenile Court Act serve different purposes. The Act is a reporting act and requires that certain individuals report suspected child abuse or neglect to DCFS. The purpose of the Juvenile Court Act, on the other hand, is to "ensure that the best interests of the minor, the minor's family, and the community are served." *In re J.J.*, 142 Ill. 2d 1, 8 (1991). Proceedings under the Juvenile Court Act are civil, nonadversarial proceedings where the court determines whether the child has been abused or neglected. *Id.* The civil rules of evidence apply. *Id.* Under the Act, a parent who is found to have abused or neglected his child is placed on the State Central Register, but under the Juvenile Court Act, the court may terminate parental rights. 705 ILCS 405/2-21(5) (West 2008). Before such a finding can be made under the Juvenile Court Act, however, the court must find that the child was abused or neglected by a preponderance of the evidence. 705 ILCS 405/2-21(5)(ii) (West 2008).

¶ 40 Due to the different purposes and rights at stake under each act, the legislature could have properly decided to cast a more narrow definition of neglect under the Act. Under the Juvenile Court Act, the court formalities provide due process protections and the court's finding must be supported by a preponderance of the evidence. Due to these added protections, once the court has made a finding of neglect, it is reasonable for DCFS to issue a nonappealable finding of neglect under section 7.16 regardless of the trial court's basis for its finding of neglect. Under the Act, however, the finding is not made by a court, and the same due process protections are not offered.

¶ 41 The legislature's decision to use certain language in one instance and different language in another indicates that the legislature intended different results. *Collins v. Board of Trustees of the Firemen's Annuity & Benefit Fund*, 155 Ill. 2d 103, 113 (1993). By deleting the environment-injurious language in 1980, the legislature chose to use different language in the Act's definition of neglected child than that included in the Juvenile Court Act. This

indicates that the legislature specifically intended these different definitions, and we reject DCFS's argument regarding absurd results.

¶ 42    The environment-injurious definition of neglect was removed from the statute in 1980. While the legislature expressed the intent to reinsert a clearer version of this definition at a later time, it did not do so until 2012, well after this case. Therefore, DCFS was without authority to include a definition of neglect in Allegation 60 that the legislature explicitly removed from the Act and to apply that definition in the present case.

¶ 43                                        CONCLUSION

¶ 44    Not every Allegation promulgated by DCFS needs to follow the exact language provided by the legislature's definition of neglect under section 3 of the Act. But here, when the legislature has specifically removed the environment-injurious language from its definition of neglect, DCFS was without authority to reestablish the environment-injurious definition of neglect. Therefore, Allegation 60 exceeds DCFS's scope of authority under the Act and it is void. Because we determine that Allegation 60 is void, we need not address whether the finding was against the manifest weight of the evidence or whether Julie Q.'s due process rights were violated.

¶ 45    The judgment of the appellate court is affirmed.

¶ 46    Affirmed.