2023 IL App (1st) 220252

FIRST DIVISION
October 16, 2023

IN THE
APPELLATE COURT OF ILLINOIS
FIRST DISTRICT

No. 1-22-0252

|  |  |  |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOS, | ) ) | Appeal from the Circuit Court of |
| Plaintiff-Appellee, | ) ) | Cook County. |
| v. | ) ) | No. 18 CR 60203 |
| JONATHAN MARTIN, | ) ) | Honorable Timothy J. Joyce, |
| Defendant-Appellant. | ) | Judge Presiding. |

PRESIDING JUSTICE FITZGERALD SMITH delivered the judgment of the court, with opinion.
Justices Lavin and Coghlan concurred in the judgment and opinion.

**OPINION**

¶ 1 Following an evidentiary hearing, the Cook County circuit court committed the 53-year-old defendant, Jonathan Martin, to the custody of the Department of Human Services (DHS) pursuant to section 104-25(g) of the Code of Criminal Procedure of 1963 (Criminal Code) (725 ILCS 5/104-25(g) (West 2018)) for a period of seven years, not to exceed August 28, 2025. On appeal, the defendant challenges the length of his commitment. He asserts that under the 2009 amendments to section 104-25(g) of the Criminal Code, section 3-6-3 of the Unified Code of

Corrections (Corrections Code) (hereinafter the truth in sentencing statute) (730 ILCS 5/3-6-3 (West 2018)) applies to determining the length of a civil commitment for a defendant previously found unfit to stand trial and "not not guilty" of the crime charged. He therefore asserts that he was entitled to serve only 85% of his seven-year commitment term. For the following reasons, we affirm.

¶ 2                                    I. BACKGROUND

¶ 3       On June 14, 2018, the defendant, who has a history of mental illness, was arrested and subsequently charged with five counts of aggravated battery (720 ILCS 5/12-3.05(a)(1), (4), (c), (d)(1), (f)(1) (West 2018)) for throwing a brick at the 71-year-old victim, Virginia Brennan, and striking her in the back.

¶ 4       On August 28, 2018, the circuit court held a fitness hearing to determine the defendant's fitness to stand trial. At that hearing, the State offered the stipulated testimony of a licensed clinical psychologist, Dr. Erick Neu. If called to testify, Dr. Neu would have stated that, based on his evaluation, the defendant was disorganized, delusional, paranoid, and unable to understand the nature and purpose of the proceedings against him. It was Dr. Neu's opinion, however, that the defendant could be restored to fitness within one year. Based on this stipulation, the circuit court found the defendant unfit to stand trial and remanded him to the custody of DHS for treatment for the statutory period of one year pursuant to section 104-16 of the Criminal Code (725 ILCS 5/104-16 (West 2018)).

¶ 5       On September 5, 2019, the circuit court held a discharge hearing (*id.* § 104-25(a)). At that hearing, the parties stipulated that, if called to testify, the defendant's treating psychiatrist, Dr. Timothy Olenek, would state that the defendant suffers from schizoaffective disorder, bipolar type, and that despite his compliance with psychotropic medications and treatment, he remains unfit to

stand trial and is unlikely to attain fitness.

¶ 6     The victim, Virginia, next testified that on June 14, 2018, she was driving her car with her husband in the passenger seat in the alley between North Lowell and Kostner Avenues. Virginia stopped her car at the crosswalk located at the mouth of the alley because she noticed the defendant standing on the sidewalk. When Virginia motioned the defendant to cross, he just stood there angrily talking to himself. When Virginia and her husband continued to motion to the defendant, urging him to cross the sidewalk, he "gave [them] the finger" and then threw a brick at the windshield of their car, shattering the glass. As Virginia's husband called the police, Virginia exited the car and followed the defendant, asking him why he had thrown the brick at them. As Virginia followed the defendant, another woman driving along the street yelled at the defendant: "[H]ey buddy, drop the brick." The defendant continued down the street, but when the woman's vehicle stopped at the next light, he threw the brick at the trunk of her car. The brick bounced back, and when Virginia, who was still following the defendant, saw the defendant pick it up again and turn toward her, she started running because she "knew" she was in danger. As she ran, the defendant threw the brick at her, hitting her back. Virginia nearly fell in the middle of the street but crawled to the parkway, where several parkgoers approached to help. She was subsequently transported by ambulance to Swedish Covenant Hospital, where she was treated for a fracture of the L4 vertebrae.

¶ 7     Based on this evidence, the circuit court found the defendant "not not guilty" of aggravated battery pursuant to section 104-25(d) of the Criminal Code (*id.* § 104-25(d)). The court further found that the defendant continued to remain unfit to stand trial and that there was no substantial probability that he would regain fitness within the statutory period of one year. The court therefore ordered that the defendant undergo an extended-term treatment (of 15 months) until December 5,

2020. See *id.* § 104-25(d)(1).

¶ 8    On June 7, 2021, upon the State's motion, the circuit court held a civil commitment hearing (*id.* § 104-25(g)(2)), at which two expert psychiatrists testified regarding the defendant's mental state. Dr. Timothy Olenek, who treated the defendant from 2018 to 2020, first opined that the defendant remained unfit to stand trial and in all probability was not likely to become fit and that he constituted a threat to public safety. Dr. Olenek reiterated that the defendant was diagnosed with schizoaffective disorder, bipolar type, and explained that this was a chronic mental illness, which includes mood swings, psychotic episodes, and disorganized and delusional thinking. Dr. Olenek stated that prior to his current admission for treatment, between 1993 and 2014, the defendant had been previously admitted to DHS nine times. Dr. Olenek acknowledged that, during his current treatment at DHS, the defendant has exhibited no aggression and has been compliant with medication. He stated, however, that the defendant refuses to partake in any group therapy and to acknowledge that he suffers from a mental illness. In fact, the defendant "still remains very paranoid" and thinks that he was the victim of the crime. Based on the defendant's lack of community support, Dr. Olenek opined that, if the defendant was released and stopped taking his antipsychotic medication, he would relapse.

¶ 9    The defendant's current treating psychiatrist, Dr. Syed Hussain, testified consistently with Dr. Olenek. He opined that the defendant remained unfit to stand trial and was unlikely to attain fitness because he does not understand either the charges against him or the seriousness of the crime and the injuries that he caused the victim. Dr. Hussain further opined that if the defendant were to be released and to stop taking his antipsychotic medication he would "most certainly" relapse because he lacks any community support. According to Dr. Hussain, the defendant poses a serious danger to the public at large and to any individuals with whom he comes into contact

because he is unaware of his mental illness and because the risk of relapse is "extremely high."

¶ 10    After hearing this evidence, the circuit court found that the defendant continued to remain unfit to stand trial. The court further found that the defendant remained a danger to himself and others and a serious threat to public safety. The court therefore ordered that pursuant to section 104-25(g)(2) of the Criminal Code (*id.*) the defendant be involuntarily civilly committed to the custody of DHS for the maximum permitted term of seven years from the date of the original finding of unfitness.

¶ 11    On July 1, 2021, the defendant filed a motion to reconsider, asking the circuit court to modify the length of his involuntary commitment. In his motion, the defendant conceded that he was subject to the maximum term of commitment of seven years based on the fact that he was charged with aggravated battery (720 ILCS 5/12-3.05(a)(1), (4), (c), (d)(1), (f)(1) (West 2018)), which is a Class 2 felony, normally punishable by three to seven years' imprisonment (730 ILCS 5/5-4.5-35(a) (West 2018)). The defendant nonetheless argued that he was entitled to good time credit served. He claimed that, had he been convicted in a criminal proceeding and sentenced to seven years, that sentence would have been served at 85% pursuant to the truth in sentencing statute (*id.* § 3-6-3) such that his maximum sentence would have been 2172 days. The defendant therefore requested that his commitment term be modified and that he be released from DHS custody no later than August 8, 2024.

¶ 12    On February 22, 2022, the circuit court denied the defendant's motion to reconsider, finding that the truth in sentencing statute (*id.*) applies only to criminal defendants and not to involuntarily civilly committed patients, like the defendant. The defendant now appeals.

¶ 13                                          III. ANALYSIS

¶ 14    On appeal, the defendant argues that the circuit court erred when it found that the truth in

sentencing statute (*id.*) does not apply to civilly committed defendants like himself. The defendant asserts that when the legislature amended section 104-25(g)(4) of the Criminal Code (see Pub. Act 95-1052, § 85 (eff. July 1, 2009) (amending 725 ILCS 104-25(g)(4))) to include a reference to article 4.5 of chapter V of the Corrections Code (730 ILCS 5/ch. V, art. 4.5 (West 2018)) it intended for the truth in sentencing statute (*id.* § 3-6-3) to apply to civil commitment proceedings. He therefore asserts that the maximum term to which he should have been involuntarily committed to DHS was 85% of the maximum seven-year sentence to which he would have been condemned had he been convicted of the crime charged, or until April 8, 2024. For the following reasons, we disagree.

¶ 15     It is axiomatic that the interpretation of a statute is a legal question subject to *de novo* review. *People v. Miles*, 2017 IL App (1st) 132719, ¶ 26. The fundamental principle of statutory construction "is to ascertain and give effect to the intent of the legislature." *In re Detention of White*, 2016 IL App (1st) 151187, ¶ 45; see *People v. Dabbs*, 239 Ill. 2d 277, 287 (2010). The most reliable indicator of that intent is the plain and ordinary meaning of the statutory language itself. *White*, 2016 IL App (1st) 151187, ¶ 45; *Dabbs*, 239 Ill. 2d at 287. In determining the plain meaning of statutory terms, a court must consider the statute in its entirety and keep in mind the subject the statute addresses and the apparent intent of the legislature in enacting that statute. *White*, 2016 IL App (1st) 151187, ¶ 45; *Dabbs*, 239 Ill. 2d at 287. If the statutory language is clear and unambiguous, it must be applied as written, without resorting to further aids of statutory construction. *White*, 2016 IL App (1st) 151187, ¶ 45; *Dabbs*, 239 Ill. 2d at 287.

¶ 16     If, however, the statutory language is ambiguous, " 'we may look to other sources to ascertain the legislature's intent.' " *Watson v. Legacy Healthcare Financial Services, LLC*, 2021 IL App (1st) 210279, ¶ 42 (quoting *Maschek v. City of Chicago*, 2015 IL App (1st) 150520, ¶ 44,

citing *Krohe v. City of Bloomington*, 204 Ill. 2d 392, 395 (2003)). " 'These other sources include primarily the statute's legislative history and debates.' " *Id.* (quoting *Maschek*, 2015 IL App (1st) 150520, ¶ 44, citing *Krohe*, 204 Ill. 2d at 398).

¶ 17    The statute at issue in this appeal reads:

> "In no event may the treatment period be extended to exceed the maximum sentence to which a defendant would have been subject had he or she been convicted in a criminal proceeding. For purposes of this Section, *the maximum sentence shall be determined by Section 5-8-1 (730 ILCS 5/5-8-1) or Article 4.5 of Chapter V of the 'Unified Code of Corrections* [(730 ILCS 5/ch. V, art. 4.5 (West 2018))]', excluding any sentence of natural life." (Emphasis added) 725 ILCS 5/104-25(g)(4) (West 2018).

¶ 18    The parties agree that prior to 2009, section 104-25(g)(4) of the Criminal Code referenced only section 5-8-1 of the Corrections Code (730 ILCS 5/5-8-1 (West 2008)) for determining the maximum commitment period allowed and that courts construing that version of the statute consistently held that involuntarily civilly committed defendants were not entitled to good time credit because the plain language of the statute did not provide for it. See *People v. Williams*, 142 Ill. App. 3d 858, 861-64 (1986); *People v. Rasgaitis*, 222 Ill. App. 3d 855, 861 (1991). The parties further agree that in 2009 Public Act 95-1052 added the additional reference to "Article 4.5 of Chapter V of the 'Unified Code of Corrections' " (730 ILCS 5/5-4.5-5 (West 2018)) as relevant to determining the maximum commitment period permitted under the Criminal Code. See Pub. Act 95-1052, § 85 (eff. July 1, 2009) (amending 730 ILCS 5/104-25).

¶ 19    On appeal, however, the parties disagree as to the impact that this additional language had on section 104-25(g)(4). Specifically, they dispute whether the reference to article 4.5 of chapter V of the Corrections Code discloses a legislative intent that the truth in sentencing statute

(730 ILCS 5/3-6-3 (West 2010)) be applied to the determination of the maximum treatment period permitted for involuntarily civilly committed defendants who were previously found unfit to stand trial and "not not guilty" after a discharge hearing.

¶ 20     The defendant contends that the plain language of the 2009 amendment to section 104-25(g) explicitly references article 4.5 of chapter V of the Corrections Code, which unlike the original version of section 5-8-1, directly provides that the truth in sentencing statute is to be applied in calculating the maximum prison sentence for criminal offenders. The defendant therefore asserts that, by including this additional refence in the 2009 amendment, the legislature clearly intended that the truth in sentencing statute (730 ILCS 5/3-6-3 (West 2018)) be applied in calculating the maximum treatment period permitted for involuntarily civilly committed defendants, such as himself.

¶ 21     The State, on the other hand, asserts that this amendment did not make any substantive changes to the Criminal Code or the method by which trial courts are to calculate the maximum treatment period for civilly committed defendants. According to the State, the purpose of Public Act 95-1052 was to reorganize and renumber the Corrections Code with respect to the sentencing of offenses. The State posits that, after that amendment, article 4.5 merely replaced section 5-8-1 of the Corrections Code in designating which sentence should be applied to each level of felony offense. The State therefore asserts that, under the plain reading of the amended statute, the truth in sentencing statute (730 ILCS 5/3-6-3 (West 2018)) does not apply to civilly committed persons such as the defendant.

¶ 22     For the following reasons, we agree with the State and conclude that the legislature did not intend for the 2009 amendment to apply good time credit to defendants found "not not guilty" and subject to involuntary civil commitment.

¶ 23    At the outset, we note that the plain language of the amended version of section 104-25(g)(4) is ambiguous. See *People v. Stewart*, 2022 IL 126116, ¶ 13 (A statute is ambiguous "if it is capable of being understood by reasonably well-informed persons in two or more different ways.").

¶ 24    The plain language of that amended section instructs trial courts to look to article 4.5 of chapter V of the Corrections Code in determining the maximum treatment period permitted for civilly committed defendants found "not not guilty" of the crime charged. Pub. Act 95-1052, § 85 (eff. July 1, 2009); 725 ILCS 5/104-25(g)(4) (West 2018). Section 104-25(g) explicitly states that

> "[i]n no event may the treatment period be extended to exceed the maximum sentence to which a defendant would have been subject had he or she been convicted in a criminal proceeding. For purposes of this Section, *the maximum sentence shall be determined by *** Article 4.5 ***.*" 725 ILCS 5/104-25(g)(4) (West 2018).

¶ 25    Article 4.5, in turn provides that a "sentence of imprisonment" for the commission of a Class 2 felony, such as the one with which the defendant was charged in the instant case, shall be "a determinate sentence of not less than 3 years and not more than 7 years." See Pub. Act 95-1052, § 85 (eff. July 1, 2009); 730 ILCS 5/5-4.5-35(a) (West 2018). Section 35(j) of article 4.5 further instructs that, for Class 2 felonies, the court should "see Section 3-6-3 of this Code" (*i.e.*, the truth in sentencing statute) for rules and regulations determining early release based on "good conduct." See Pub. Act 95-1052, § 85 (eff. July 1, 2009); 730 ILCS 5/5-4.5-35(j) (West 2018).

¶ 26    However, section 100 of article 4.5, titled "Calculation of Term of Imprisonment," then directs trial courts in the following ambiguous manner:

> "(a) COMMENCEMENT. A sentence of imprisonment shall commence on the

date on which the offender is received by the Department or the *institution* at which the sentence is to be served.

(b) CREDIT; TIME IN CUSTODY; SAME CHARGE. The offender *shall be given credit on the determinate sentence or maximum term* and the minimum period of imprisonment for time spent in custody as a result of the offense for which the sentence was imposed, *at the rate specified in Section 3-6-3* (730 ILCS 5/3-6-3). Except when prohibited by subsection (d), *the trial court may give credit to the defendant* for time spent in home detention, or *when the defendant has been confined for psychiatric* or substance abuse *treatment prior to judgment*, *if the court finds that the detention of confinement was custodial*." Pub. Act 95-1052, § 85 (eff. July 1, 2009).

See 730 ILCS 5/5-4.5-100 (West 2018).

¶ 27    For a defendant such as the one here, charged with a Class 2 aggravated battery, the "rate specified in Section 3-6-3" is the receipt of "no more than 4.5 days of sentence credit for each month of his *** sentence of imprisonment." *Id.* § 3-6-3(a)(2)(ii).

¶ 28    There are two possible readings of the aforementioned plain language of the amended statute. On the one hand, section 100 of article 4.5 can be read together with section 104-25(g)(4), to require courts to apply good conduct credit at the rate specified by the truth in sentencing statute in calculating the maximum prison sentence for criminal offenders and thereby correspondingly the maximum treatment period for civilly committed defendants. See Pub. Act 95-1052, § 85 (eff. July 1, 2009); 730 ILCS 5/5-4.5-100(b) (West 2018) ("[T]he offender *shall be given credit on the determinate sentence or maximum term*" "*at the rate specified in Section 3-6-3*." (Emphases added.)); 725 ILCS 5/104-25(g)(4) (West 2018) ("[i]n no event may the treatment period be extended to exceed the maximum sentence to which a defendant would have

10

been subject had he or she been convicted in a criminal proceeding. For purposes of this Section, *the maximum sentence shall be determined by \*\*\* Article 4.5*.").

¶ 29    On the other hand, because the second sentence of section 100 of article 4.5 merely gives trial courts discretion to give defendants credit for time spent "confined for psychiatric \*\*\* treatment prior to judgment" if the court also finds that the confinement was "custodial," the statute can be read as trying to distinguish between two different classes of defendants—*i.e.*, those convicted and sentenced for the crimes charged, who are entitled to good credit under the truth in sentencing statute, and those civilly committed prior to a judgment of guilt or innocence, whose entitlement to credit will depend on the trial court's discretion and the type of psychiatric confinement they received. See Pub. Act 95-1052, § 85 (eff. July 1, 2009); 730 ILCS 5/5-4.5-100 (West 2018).

¶ 30    This second interpretation is further supported by the different treatment the amended statute affords defendants found guilty by reason of insanity. Unlike subsection (g)(4), subsection (c) of section 104-25 of the Criminal Code (725 ILCS 5/104-25(c) (West 2018)), which deals with such defendants, provides that to determine their sentences a court should look to section 5-2-4 of the Corrections Code (730 ILCS 5/5-2-4 (West 2018)). That section, in turn, states that, if a defendant found not guilty by reason of insanity needs inpatient mental health services, "[s]uch period of commitment shall not exceed the maximum length of time that the defendant would have been required to serve, *less credit for good behavior* as provided in Section 5-4-1 of the Unified Code of Corrections." (Emphasis added.) *Id.* § 5-2-4(b). There is no corresponding language in subsection (g) or article 4.5 that states good time credit must be given to defendants found unfit to stand trial and "not not guilty" of the crime charged.

¶ 31    Accordingly, because there is more than one interpretation of the plain language of the

amended statute, we must turn to legislative history to determine the legislature's intent. *Watson*, 2021 IL App (1st) 210279, ¶ 42 (where a statute is ambiguous, we may look to other sources such as the statute's "legislative history and debates" to ascertain the legislature's intent (internal quotation marks omitted)); see *Maschek*, 2015 IL App (1st) 150520, ¶ 44 (when interpreting an ambiguous statute, courts look to legislative discussions); see also *K. Miller Construction Co. v. McGinnis*, 238 Ill. 2d 284, 299 (2010) ("while an amendatory change in the language of a statute creates a presumption that it was intended to change the law as it previously existed," this presumption "is not controlling" and "may be overcome by other considerations," such as demonstrated legislative intent (internal quotation marks omitted)); see also *Krohe*, 204 Ill. 2d at 395; *In re Pension Reform Litigation*, 2015 IL 118585, ¶ 68; *Julie Q. v. Department of Children & Family Services*, 2013 IL 113783, ¶ 31.

¶ 32    The legislative discussions prior to the passage of the statutory amendment reveal that the legislature did not intend to substantively change the Criminal Code. During the Illinois Senate hearings regarding the 2009 statutory amendments, Senator Cullerton explained that Public Act 95-1052, introduced as Senate Bill 100,

> "comes from the CLEAR Commission, which is a commission that Senator Dillard and I serve on, which is rewriting the Criminal Code. This particular aspect of the rewrite is to recodify the sentencing provisions of the Code of Corrections. *Does not make any substantive changes*, but—recodifies them and puts them in a different order. And it does codify some Illinois Supreme Court decisions that control the implementation and the effect of these provisions. The purpose is to make the sentencing provisions easier for judges and attorneys and—to understand and to reduce the number of resentencing hearings caused by improper dispositions." (Emphasis added.) 95th Ill. Gen. Assem.,

Senate Proceedings, May 24, 2007, at 14-15 (statements of Senator Cullerton).

¶ 33    Similarly, during the Illinois House of Representatives proceedings, Representative Turner explained that the purpose of Public Act 95-1052 was to "codify the sentencing Code so that we can go to one section in the Criminal Code and be able to determine what sentence should be given for the particular crime committed." 95th Ill. Gen. Assem., House Proceedings, November 20, 2008, at 31 (statements of Representative Turner). Representative Durkin further stated: "This is *strictly just a reorganization* Bill that's going to help the practitioners, not only the court, the judges, but also the prosecutors, the public defenders and private attorneys who are defense counsel." (Emphasis added.) 95th Ill. Gen. Assem., House Proceedings, November 20, 2008, at 33 (statements of Representative Durkin).

¶ 34    These comments make it abundantly clear that the legislature did not envision any substantive changes to the Criminal Code.

¶ 35    In fact, the legislature codified its intent not to make any substantive changes in the Criminal Code when it wrote article 4.5. Specifically, section 990(b) of that article reads in pertinent part:

> "A provision of this Article 4.5 or any other provision of this amendatory Act of the 95th General Assembly that is the same or substantially the same as a prior law shall be construed as a continuation of the prior law and not as a new or different law." 730 ILCS 5/5-4.5-990(b) (West 2018).

¶ 36    The legislature's intent for the statute's application to remain unchanged is further demonstrated by the simultaneous amendment to section 5-8-1 of the Corrections Code. Prior to the passage of Public Act 95-1052, which created article 4.5 of chapter V of the Code of Corrections, section 5-8-1 of that Code read:

13

"[E]xcept as otherwise provided in the statute defining the offense, for a Class X felony, the sentence shall be not less than 6 years and not more than 30 years;

(4) for a Class 1 felony, other than second degree murder, the sentence shall be not less than 4 years and not more than 15 years;

(5) for a Class 2 felony, the sentence shall be not less than 3 years and not more than 7 years;

(6) for a Class 3 felony, the sentence shall be not less than 2 years and not more than 5 years;

(7) for a Class 4 felony, the sentence shall be not less than 1 year and not more than 3 years." 730 ILCS 5/5-8-1 (West 2008).

¶ 37    After the enactment of Public Act 95-1052, the above language was removed and recodified in the newly created article 4.5. Because there is no longer any reference to these sentencing provisions in section 5-8-1, the addition of article 4.5 in its place evinces the legislature's intent to provide a new path to finding the same sentencing provisions.

¶ 38    Because the new version of section 104-25(g)(4) is substantially the same as the pre-2009 statute, we must construe it as continuation of the prior law. Since the original version of the statute did not allow involuntarily civilly committed defendants found unfit to stand trial and "not not guilty" of the charged crime to receive good time credit under the truth in sentencing statute, we find that, under the amended statute, the defendant here is similarly not entitled to any. See *Williams*, 142 Ill. App. 3d at 861-64 (holding that under the original statute, "the legislature specifically intended to exclude good-time credit to those defendants who have been involuntarily civilly committed after being found unfit to stand trial"; noting that the statute clearly distinguishes between defendants who have already been adjudicated guilty or innocent

14

and are entitled to good time credit and those who were involuntarily civilly committed after being found unfit to stand trial, and who are not entitled to good credit because they are "no longer consider[ed] *** criminal[s]"); see *Rasgaitis*, 222 Ill. App. 3d at 861 (following *Williams*).

¶ 39                              III. CONCLUSION

¶ 40     For these reasons, we find that the trial court properly held that the truth in sentencing statute does not apply to the defendant in the instant case. We therefore affirm the seven-year commitment period imposed by the trial court.

¶ 41     Affirmed.

*People v. Martin*, 2023 IL App (1st) 220252

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 18-CR-60203; the Hon. Timothy J. Joyce, Judge, presiding. |
| **Attorneys for Appellant:** | Sharone R. Mitchell, Jr., Public Defender, of Chicago (Katherine Polak, Assistant Public Defender, of counsel), for appellant. |
| **Attorneys for Appellee:** | Kimberly M. Foxx, State's Attorney, of Chicago (Enrique Abraham, Erin K. Slattery, and Kimberly C. Reeve, Assistant State's Attorney, of counsel), for the People. |